HOWARD F. MOFFITT, appellant, v. FUTURE ASSURANCE ASSOCIATES, INC., and SCOTT JORDAN, trustee for the Emma Davies estate, appellees.

No. 51899.

(Reported in 140 N.W.2d 108 and 141 N.W.2d 776)

FEBRUARY 8, 1966.

MODIFIED AND REHEARING DENIED APRIL 19, 1966.

D. C. Nolan and John T. Nolan, both of Iowa City, and John Droz, of Fairfield, for appellant.

Richard Q. Madsen and Scott Jordan, both of Fairfield, for appellees.

MASON, J.—This controversy as to ownership of an irregular tract of land in Jefferson County referred to as "Cedar Bottom" or "Cedar Creek" tract came to a head in December 1961 when defendant Future Assurance Associates, Inc. brought action under section 471.4(4), Code, 1958, to condemn an access road to Cedar Bottom through the Hill and Bottom land of plaintiff Moffitt. Pursuant thereto the sheriff's commission filed its report assessing damages to plaintiff at $1635 plus expenses.

Plaintiff appealed and filed his petition in five divisions, alleging: (1) Defendant does not own the land for which it sought to condemn a roadway. (2) Plaintiff owns the tract referred to as the landlocked area for which defendant seeks to condemn the roadway across plaintiff's land and defendant is, therefore, not entitled to the roadway. (3) Plaintiff acquired Cedar Bottom by adverse possession and title should be quieted

in him. (4) Plaintiff is entitled to the difference between the value of the landlocked or Cedar Bottom without the improvements he placed thereon and its value as improved and such values should be determined and ascertained as provided by chapter 560, Code, 1958. (5) Inadequacy of the award of damages for which $10,000 should be allowed because of the taking of approximately five acres including the area adjacent to the fences on each side of the road, together with fees for plaintiff's attorney.

Defendant Scott Jordan, trustee, interposed no defense, Future Assurance Associates, Inc. will be referred to as defendant.

Defendant's answer denied generally the various paragraphs of each division of the petition.

Trial was in equity. The trial court's decree held the Cedar Bottom tract is landlocked and defendant owns sufficient interest in it by way of deeds from the heirs and successors in interest to support its application for condemnation of a way across plaintiff's land; plaintiff owns no interest in the Cedar Bottom land by adverse possession or otherwise and his petition should be dismissed. Plaintiff appeals.

Plaintiff's propositions relied on for reversal are: (1) The trial court's failure to make any finding whether plaintiff made a sufficient showing of adverse possession when it limited its finding to the period of plaintiff's adverse possession after 1960. (2) Failure to hold plaintiff's adverse possession had been established well within the ten-year statutory period prior to 1960, and ruling the statutory period had been interrupted during foreclosure proceedings. (3) Error in holding plaintiff had failed to establish legal ownership for the reason he established no color of title and holding plaintiff had failed to establish a sufficient claim of right. (4) Failure to hold defendant acquired no interest in the land by virtue of tax deeds issued by Jefferson County. (5) Error in ruling the county maintained such interest in the land as would negate plaintiff's claim of ownership by adverse possession. (6) Failure to hold defendant had no legal interest whatsoever in the land by virtue of the tax certificate and sale proceedings under the auspices of Jefferson County.

(7) Failure to hold plaintiff's claim by adverse possession is superior to any claim of defendant obtained by quitclaim deeds from the heirs of the predecessors in interest to the land.

I. The trial court concluded the principal question is whether plaintiff had acquired legal ownership of Cedar Bottom by adverse possession.

Cedar Bottom, consisting of 140 to 160 acres, has no outlet to a highway and never had any access roadway except across the rest of plaintiff's farm. It was bounded on the west, north and northeast by land owned by plaintiff (referred to in argument as the Hill land), on the east by land owned by Earl and Leslie Zillman and on the south and west by Cedar Creek.

Plaintiff first became acquainted with the farm in 1952 or 1953. Geraldine and Leslie Mann were then the owners in possession. Plaintiff was first shown the farm in 1955 by the Manns and Pat Campbell, a real-estate dealer. Both told plaintiff the farm went to Cedar Creek. At that time there were no fences separating Cedar Bottom from the rest of Manns' farm. The fences ran north and south across the tract in controversy down to the change in the channel of the old Cedar Creek.

That spring plaintiff purchased the Mann farm of approximately 1000 acres, first on contract, then by deed. He took possession just before Easter in 1955 and started farming immediately, entering into a rental agreement some weeks later. He took over the livestock and machinery on the farm, added some machinery and a dairy operation. Approximately two months after plaintiff acquired the property, it was foreclosed by John Hancock Mutual Life Insurance Company on a mortgage given by the Manns, and plaintiff's interest was cut off. Sheriff's sale was had September 7, 1955. Mrs. Emma Davies, owner of a second mortgage, redeemed the farm and sold it to plaintiff on contract dated January 31, 1956. Plaintiff testified he had remained in possession during the period of redemption.

After plaintiff had originally entered into possession of the Mann farm, he farmed at least a portion of Cedar Bottom until 1962. He testified he first learned of defendant's claim to Cedar Bottom at the time of the condemnation proceedings in 1961, no

one else to his knowledge ever asserted any claim of ownership or right of possession to Cedar Bottom until the present action.

The record is silent as to the use of Cedar Bottom previous to 1936.

Raymond Cook, who presently lives on a farm joining the Moffitt farm on the east, farmed the Mann farm (referred to also as the Hill land) from 1936 to 1940 on a share lease from the receiver of the Iowa State Bank. He recalled the lease referred to the tract as the Stever land, the former owners, describing it as all land on the north side of the Creek south of the highway. He farmed the Mann farm and Cedar Bottom as one tract, there being no fence separating them. When the crops were harvested from the entire operation, the grain went into the same crib and bin, Cook taking the tenant's share and giving the landlord his share. No distinction was made between the crops from Cedar Bottom and those from the remainder of the farm.

The bank receiver sold the Hill and Bottom land in 1940 to one Malmsted. Frank Brown then moved on the farm and operated it until 1949 as Malmsted's tenant on a share rent with cash for hay and pastureland. Brown conducted a general farming operation, grain and livestock, on all the land including Cedar Bottom. He had cattle which he permitted to run on the Cedar Bottom. There were then no fences separating that tract from the rest of the land. Brown testified he understood and considered Cedar Bottom a part of the entire farm he had leased from Malmsted and it all went together as one farm. To his knowledge nobody ever claimed the right to Cedar Bottom or attempted to use it during the nine years he was a tenant other than himself. He made no distinction in dividing the grain from Cedar Bottom and the rest of the farm, taking his share and giving the landlord his share. Brown remained on the farm until Mr. Mann moved there.

Earl Zillman, co-owner of the land east of Cedar Bottom, became acquainted with the tract in controversy since Mann owned it in 1949 or 1950. When he sought Mann's permission to go hunting, Mann told him where his farm lay so he could stay within the boundary, indicating the land ran south from the house to Cedar Creek. While hunting he saw Mann and his

employees working and Mann's equipment on Cedar Bottom at different times every year from 1949 until plaintiff got the place. After Mann left he got permission to hunt from Les Zillman, his brother, who was acting as plaintiff's agent.

After plaintiff acquired the land Zillman operated plaintiff's cornpicker which was down in the Cedar Bottom tract. In 1956 Zillman raised corn on part of Cedar Bottom. Plaintiff hired Zillman to help build a line fence on the east side of the tract.

Oliver Small, a farmer and operator of a custom combine, knew Mann. He had rented a part of the farm prior to plaintiff's acquiring it and picked corn for Mann in Cedar Bottom in 1949. That year Mann had all tillable land in corn. When it got a little late Mann would hire a custom cornpicker to help. When Small picked corn he put the corn from Cedar Bottom with that from the rest of the farm in the same crib. In 1955 Small rented the big field south of the building, including Cedar Bottom, on a sharecrop basis, putting the landlord's share in the crib by the house and taking his share home. No distinction was made between the crop from the two tracts. In 1957 Small rented the whole farm, including Cedar Bottom, from plaintiff on a sharecrop basis. He put plaintiff's share from Cedar Bottom in the same crib as the corn from the rest of the farm.

When Campbell listed the farm for sale, Mann told him the southern boundary ran to the Creek and he listed and showed the farm to many prospective purchasers as running south to Cedar Creek, including Cedar Bottom. In the spring Campbell and plaintiff were shown the farm by Mann. Campbell testified as the three drove over the farm there were no fences to go through to get to Cedar Bottom, the previous year's corn crop was not picked, Mann's picker was there and his cattle were roaming unrestricted on Cedar Bottom. On this occasion Mann again told them the land went clear to Cedar Creek. It was Campbell's understanding when plaintiff made the deal that the land went to the Creek.

After acquiring the farm plaintiff started improving it. He retained Leslie Zillman as farm manager regularly from 1955 to 1960 and periodically since then. In the spring of 1955 he hired

a bulldozer to clear a strip through the brush to run a north-south fence line in proximity to the east boundary of Cedar Bottom to hold cattle, straightened Mitchell Creek to run in a course south along the east boundary of Cedar Bottom, cut down large trees along the abandoned channels of Cedar Creek and Mitchell Creek, bulldozed, cleared and piled into abandoned channels roots of trees and brush, laid tile and spread limestone. It took approximately three years to clear Cedar Bottom, resulting in four fifths of the area being tillable, at a cost of approximately $16,000. In 1958 a combination corncrib and granary was built on Cedar Bottom at a cost of approximately $5000.

Zillman testified he had been on the farm when Mr. Mann had it and there was nothing to indicate Cedar Bottom was used any differently or occupied by anyone but Mr. Mann. When plaintiff acquired the farm Mann took Zillman over the land and indicated and pointed out to him Cedar Bottom and stated it was part of the land. Under his supervision the entire farm, Hill and Cedar Bottom, was operated as it had been since before 1936.

The description in the deed from Manns to Interstate Land and Farm Company (which is one and the same as plaintiff) and in the contract from Emma Davies to plaintiff did not include Cedar Bottom.

Plaintiff did not pay any taxes on Cedar Bottom during all the years he was in possession thereof. It was his custom in paying the taxes on his land in Jefferson County to send a blank check to the county treasurer who computed the tax and filled in the amount due. All crops grown on the land were taken by plaintiff or his agent.

II. Prior to 1935 a drainage district was organized for dredging a straight channel across the southeast edge of Cedar Bottom and other land. The operation was financed by the issue of bonds dated December 1, 1935, and March 1, 1941, due in different months between 1945 and 1950 secured by the land in controversy. They were eventually sold to a bank in Council Bluffs. The bonds remained outstanding and uncancelled on July 22, 1960.

Taxes on the various tracts of Cedar Bottom were not paid for some or all of the years 1929 to 1944 and tax certificates per-

taining to and including all of Cedar Bottom plus some land not in controversy were issued to Jefferson County at various intervals between December 21, 1935, and December 3, 1945. The county took no steps to acquire tax deeds because of unpaid or outstanding drainage bonds affecting the land in controversy.

On the 6th and 10th of November, 1959, quitclaim deeds covering all the land included in Cedar Bottom, and other land, were acquired by Myron N. Brun from F. F. Johnson, administrator of the George F. Stever estate, and the successors in interest of the previous owners of Cedar Bottom, the Stever people. These deeds were filed for record December 21, 1959.

Prior to 1960 the land in controversy was carried on the Jefferson County tax records under the names of Johnson and Stever.

In December 1959 the drainage bonds affecting the land involved were acquired by assignment from the bank for Myron Brun.

On December 21, 1959, the county auditor caused a notice of expiration of the period of redemption from the tax sales of the tracts in Cedar Bottom to be served. The auditor's affidavits of service are dated April 12 and 13, 1960. Notice and affidavits of service were filed April 14.

April 15, 1960, the drainage bonds obtained for Brun and K. H. Strong were presented to the treasurer's office. On July 22 the bonds were cancelled and the treasurer deeded the land including Cedar Bottom and other land to Jefferson County. The same day the county issued a deed to Myron N. Brun and K. H. Strong. These deeds were recorded July 26 when the county treasurer collected from Brun and Strong the full amount of back taxes, interest and penalties on the land in question as shown by the tax books. These amounted to slightly over $4000 as a part of the transaction for the quitclaim deeds from Jefferson County to Strong and Brun.

Subsequently the interest of Brun and his wife in the tract was deeded to K. H. Strong who conveyed the land to the present defendant.

The court held the notice of expiration of period of redemption and affidavits of service did not conform to the requirements

of Code section 447.9 in that the notice was not served on the person in possession of such real estate, plaintiff and his tenants were in possession at the time of the service of notice and the tax deed to Jefferson County was, therefore, void.

Defendant's reliance on title by quitclaim deed from Jefferson County was determined adversely to defendant.

III. The trial court held that when the county treasurer issued tax certificates to the county it held them for the benefit of all taxing bodies and adverse possession could not run against the land so long as the county held the certificates and that plaintiff and his predecessors in title acquired no right by their occupancy and use of the land from and after the date of the tax sales in 1935, 1936 and 1937 until 1960 when the interest of the state and county was divested by payment of all back taxes, interest, penalties and costs by defendant's grantors. Of course there could be no adverse possession for the statutory period since 1960.

IV. The trial court erred in its conclusion as to the nature of the county's interest while it held the tax certificates.

The issuance of the tax certificate to Jefferson County as purchaser did not divest the title of the former owners of the tract involved nor create such interest in the purchaser during the period it held such certificate as would bar a claim of adverse possession if the claimant otherwise established the elements for such claim.

The holder of a tax certificate has only a chattel. It does not constitute an interest in the property. Witmer v. Gibbs, 234 Iowa 725, 730, 13 N.W.2d 802, 804, and citations. The holder of a tax certificate has, prior to the issuance of a tax deed, merely an inchoate right or lien which can ripen into title only upon compliance with the statutory requisites. Patterson v. May, 239 Iowa 602, 610, 29 N.W.2d 547, 552; Blackford v. Judith Basin County, 109 Mont. 578, 98 P.2d 872, 879, 126 A. L. R. 639; 51 Am. Jur., Taxation, section 1082. It does not create or pass nor profess to pass title.

When the tax becomes delinquent the land is sold, not forfeited, to the state. The purchaser gets his certificate of purchase as evidence of his equitable title and lien during the time

for redemption and entitles him to a deed passing title after the time for redemption has expired. Until the deed is made by the treasurer to the tax purchaser, legal title remains in the owner. Williams v. Heath, 22 Iowa 519, 524 (Stiles) ; Eldridge v. Kuehl, 27 Iowa 160, 174 (Stiles) ; Thornton v. Jones, 47 Iowa 397, 399 (Runnells) ; 85 C. J. S., Taxation, section 822.

V.  Plaintiff contends when he purchased the Hill farm the southern boundary was represented to him as extending to Cedar Creek and included, and intended to include, Cedar Bottom although such tract was neither described in the Mann deed nor the Davies contract. He further argues in support of this contention the receiver of the Iowa State Bank in leasing the property to Raymond Cook from 1936 to 1940 and conveying it to Malmsted in 1940 intended to include Cedar Bottom as a part of the entire farm. Based upon such acts of the receiver, plaintiff's understanding and under claim of right so founded, plaintiff and his predecessors immediately upon acquiring such farm took possession thereof, including Cedar Bottom, and for more than ten years maintained such possession openly, exclusively and adversely to the claims of all other persons.

As an aid in determining the question whether plaintiff carried the burden to establish his title by adverse possession, the following legal principles are relevant.

One claiming title by adverse possession must establish all its constituent elements by clear and positive proof; it cannot be made out by inference. There are usually no equities in favor of one who claims property of another by adverse possession and his acts are to be strictly construed. While title by adverse possession is a legal title in fee simple, the doctrine is to be taken strictly. The law presumes the possession of land is under the regular title. Lawse v. Glaha, 253 Iowa 1040, 1046, 114 N.W.2d 900, 903, and citations; Meyers v. Canutt, 242 Iowa 692, 696, 46 N.W.2d 72, 75, 24 A. L. R.2d 1.

To establish ownership by adverse possession plaintiff was required to prove hostile, actual, open, exclusive and continuous possession, under claim of right or color of title, for at least ten years. Meyers v. Canutt, supra, and citations; Burgess v. Leverett and Associates, 252 Iowa 31, 35, 105 N.W.2d 703, 706.

██ ██ "To constitute adverse possession, or to set in operation the statute of limitations, does not necessarily require the claimant to live upon the land, or to enclose it with fences, or to stand guard at all times upon its borders, to oppose the entry of trespassers or hostile claimants. It is enough if the person pleading the statute takes and maintains such possession and exercises such open dominion as ordinarily marks the conduct of owners in general, in holding, managing, and caring for property of like nature and condition." Whalen v. Smith, 183 Iowa 949, 953, 167 N.W. 646, 647, cited in Clear Lake Amusement Corporation v. Lewis, 236 Iowa 132, 138, 18 N.W.2d 192, 195.

██ Actual possession is the type of possession or control owners ordinarily exercise in holding, managing and caring for property of like nature and condition. The possession of grantors claiming title may be tacked to the possession of the claimant. Possession of a tenant is possession by the claimant. The same is true of possession by a purchaser under an executory contract of sale. Burgess v. Leverett and Associates, supra, and citations.

██ To start the statute running in his favor the adverse claimant must enter upon the land under such conditions as give rise to a cause of action in favor of the true owner. Burgess v. Leverett and Associates, supra.

██ To establish title by adverse possession the claim of right must be as broad as the possession, that is, it was incumbent on plaintiff to prove that he intended to claim to the Creek whether the true line or not. Brewer v. Claypool, 223 Iowa 1235, 1238, 275 N.W. 34, 35.

██ Claim of right is distinct from claim "under color of title." We have said that claim of right or "hostile claim" need not be under color of title. This is the general rule as respects land actually occupied. Wallis v. Clinkenbeard, 214 Iowa 343, 347, 242 N.W. 86, 88; Paul v. Mead, 234 Iowa 1, 10, 11 N.W.2d 706, 711.

██ The making of improvements on disputed strip of land by occupant thereof were acts characteristic of an owner rather than those of a mere licensee who owns adjoining property upon which such improvements could conveniently be placed, and

indicate occupancy under claim of right essential to adverse possession. Vander Zyl v. Muilenberg, 239 Iowa 73, 78, 29 N.W. 2d 412, 415.

We have held payment of taxes is not essential to the acquisition of title by adverse possession. Wallis v. Clinkenbeard, supra, at page 347 of 214 Iowa, page 87 of 242 N.W.; Vander Zyl v. Muilenberg, supra, at page 79 of 239 Iowa, page 415 of 29 N.W.2d.

Applying the foregoing propositions to the detailed facts narrated in Division I hereof, we conclude plaintiff sustained the burden and established title by adverse possession to the Cedar Bottom tract prior to 1959.

Having determined in Division IV the tax certificate holder did not acquire such interest in the Cedar Bottom tract as would bar a claim of adverse possession against the original owners, it follows the owners' interest was cut off by such adverse possession and defendant acquired nothing by virtue of the quitclaim deeds procured from prior owners, their heirs or successors in interest and it has no interest as would entitle it to maintain the condemnation proceedings.

VI. The judgment of the trial court in dismissing plaintiff's petition is reversed and the cause remanded with directions to quiet title in plaintiff to Cedar Bottom tract as described in the petition, determine and decree defendant is not entitled to have a right-of-way or roadway condemned across plaintiff's other land, determine the amount which defendant is legally entitled to recover of taxes, interest and penalties paid by defendant on July 22, 1960, on Cedar Bottom as well as any subsequent taxes, interest and penalties defendant is shown to have paid thereon and the amount paid for drainage assessments on such tract, less such an amount, after an accounting by defendant of the income from the premises since it has been in its possession, as defendant is indebted to plaintiff for the use of said premises, and decree the same with interest a lien upon Cedar Bottom if the same are not paid by plaintiff within 90 days from April 19, 1966. Costs will be taxed against defendant.—Reversed and remanded.

All JUSTICES concur.